THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v A. HAMID ALIZADEH, Defendant-Appellant.

First Department, June 29, 1982

### APPEARANCES OF COUNSEL

*Spiros A. Tsimbinos* for defendant-appellant.

*Richard D. Carruthers* of counsel (*Arthur G. Weinstein* with him on the brief; *Edward J. Kuriansky*, attorney), for respondent.

### OPINION OF THE COURT

SANDLER, J.

The defendant was convicted after a jury trial of one count of grand larceny in the second degree, one count of grand larceny in the third degree, and 163 counts of offering a false instrument for filing in the first degree, and sentenced to concurrent terms of six months' imprisonment.

The defendant is a doctor, specializing in obstetrics. Of foreign ancestry, the defendant interned and took his residency at American hospitals, primarily in the New York area. He became licensed to practice medicine in New York in 1965. In 1968 he established a medical office in the Williamsburg section of Brooklyn where his practice was drawn from a predominantly low income group, and became associated with the St. John's Episcopal Hospital.

In the same year the defendant was registered as a Medicaid provider. In 1975 he established the Williamsburg Medical Clinic which was licensed during that year to perform abortions, and commenced doing so in January, 1976.

Of the 165 counts of which the defendant stands convicted, all but two involve a repetitive billing practice that the defendant concededly followed during the several years embraced by the indictment, 1975 through 1979, and which the defendant testified that he adopted and pursued consistently from the time he first began to bill the Department of Social Services (Department) for medical services. In connection with the delivery of babies it was the defendant's practice to bill the Department under two code numbers: (1) Code No. 4825 providing reimbursement of up to $200 for total obstetrical care, and (2) Code No. 9035 providing reimbursement during the years covered by the indictment of up to $15 for total new born care in a hospital provided by a physician other than a pediatrician.

The remaining two counts concern the operations of the Williamsburg Medical Clinic. Count 117, one of the many false filing counts, in substance charged the defendant with billing the Department for an abortion that was not in fact performed. The second count, charging the defendant with grand larceny in the third degree, in substance alleged that the defendant caused to be included in the October and November monthly invoices of the clinic the representation that abortions had been performed during those months for women who in fact had been the subject of abortions in January of 1976 and for which previous claims for reimbursement had been disapproved because they had occurred prior to the effective date of the clinic reimbursement rate.

After a careful study of the trial records and the exhibits, we have concluded that the defendant's conviction on Count 117 for billing the Department for an abortion that he knew had not been performed was against the weight of the evidence, indeed very clearly so. In addition, the evidence was legally insufficient to support the defendant's conviction for grand larceny in the third degree (Count 2), charging him with fraud in billing for abortions previously performed when the clinic was ineligible for reimbursement, although licensed to perform abortions.

As to the remaining counts, all involving the billing practice previously described, the evidence, although presenting troublesome questions, was legally sufficient and provided an adequate basis for the jury's verdicts. However, these counts should be reversed and remanded for a new trial because of trial errors. One error, specifically relating to these counts, was a ruling that excluded from the jury's consideration evidence clearly relevant to a determination of defendant's intent.

The most substantial of the trial errors, however, occurred during the course of the defendant's cross-examination. Over repeated objections, the prosecutor was permitted to put before the jury in detail by way of questions, some accompanied by inappropriate rhetorical excesses, findings by the Department of Health with regard to the operation of the Williamsburg Medical Clinic that were wholly irrelevant to the issues before the jury, had no appropriate bearing on credibility, and which were severely prejudicial to the defendant.

Turning first to Count 117, charging the filing of a false instrument seeking payment for an abortion that was not performed, a young woman, Luz Martinez, testified that in December, 1976 (apparently December 4) she went to the Williamsburg Medical Clinic to ascertain whether she was pregnant, that blood and urine samples were taken by a nurse, that she was then told that she was not pregnant, that a doctor gave her an injection "to make my period come down" and that no abortion was performed. The clinic folder included a paper confirming that the pregnancy test had proved negative. Taken by itself this evidence is both credible and persuasive that Ms. Martinez was not the

subject of an abortion and that the defendant could not properly have billed the Department for having performed an abortion.

The problem arises when the evidence is considered in light of the entire contents of the clinic folder relating to the supposed abortion as well as the totality of the circumstances disclosed. In addition to the pregnancy test and the notes of the defendant, the clinic folder, introduced by the People, contains a number of records with entries in several handwritings, disclosing in detail every step of the processing of Ms. Martinez for the abortion and extending to after-operation care. The testimony identifies explicitly the handwriting on various papers in the folder of three persons other than the defendant.

Most important of these are the handwritten notes of Dr. Sanchez, a witness at the trial. Dr. Sanchez, an anesthesiologist, testified that he frequently attended the Williamsburg Medical Clinic in his professional capacity on Saturdays, the day when abortions were performed at the clinic. He identified as having been written by himself notes in the clinic folder describing the administration of an anesthetic to Ms. Martinez. By any standard Dr. Sanchez is a physician of distinction. He is board certified, a Fellow of the American College of Anesthesiologists, a member of the New York State Board of Medicine, which has responsibility for dealing with charges of professional misconduct, and at the time of his testimony had been for many years Director of Anesthesiology at St. John's Episcopal Hospital. Dr. Sanchez had no ownership in the operation of the clinic. Nothing in his testimony suggests the slightest basis for doubting his integrity and truthfulness.

In addition, Aioraida Ramirez, a veteran, self-employed registered nurse, testified that she was one of several registered nurses who worked on Saturdays at the Williamsburg Medical Clinic in connection with the performance of abortions, and identified entries in the Martinez folder, clearly confirming the fact of the abortion, as having been written by another registered nurse.

The defendant himself identified other notes in the folder describing a physical examination of Ms. Martinez as

having been written by one of several internists who worked at the clinic on Saturdays.

In short, if the doctor was in fact guilty of this charge, it would inescapably follow that these three others, two of them doctors, one of obvious distinction, and a registered nurse, none of whom had an ownership interest in the clinic, somehow collaborated in the preparation of a fictitious body of records to establish the performance of an abortion that never took place, and that they joined together to perpetrate this fraud to permit the defendant to receive $100 reimbursement personally and the clinic to receive reimbursement in the amount of $43.41. We must further assume that it occurred to none of these conspirators to remove from the folder the record disclosing that the pregnancy test was negative. All this is in the highest degree improbable.

The improbability is further enhanced when it is considered that only one such charge was submitted to the jury with regard to a clinic that by December, 1976 had billed the Department for close to 300 abortions, notwithstanding obviously strenuous efforts by the prosecutor to establish other similar acts.

It is true that the indictment had charged the defendant with falsely claiming three other abortions performed on two women. These were withdrawn by the prosecutor at the trial court's pointed suggestion that they would otherwise be dismissed. Without detailing the evidence relating to these other charges, they were so totally without merit that it constituted an act of serious prosecutorial misjudgment for the defendant to have been indicted with regard to them or for evidence relating to them even to have been submitted during the course of the trial. The defendant could have been convicted on these charges only if it were believed that he, or someone acting on his behalf, had somehow secured from two women who had never been to his clinic their Medicaid cards without their knowing it, photocopied the cards to permit the creation of several wholly fictitious folders again involving the handwriting of a number of different people, and again without their knowledge had managed to return the cards to them. Incredibly the prosecutor urged this dubious hypothesis on

the trial court in response to the court's suggestion that the charges be dropped, and even on this appeal suggests that their withdrawal was somehow an act of grace.

If the issue presented on this count had simply involved a weighing of the credibility of Ms. Martinez against the clear implications disclosed by the contents of the folder in the light of all the circumstances, it would seem to me that a reasonable doubt would have been presented notwithstanding Ms. Martinez' apparent truthfulness. It is not necessary to make that judgment. Obvious on the face of the record is an alternative, more probable explanation which reconciles all of the testimony presented, including the otherwise inexplicable pregnancy test, which did not seem to have occurred either to the prosecutor or to the defense counsel and accordingly was not presented to the jury.

The evidence makes clear that the processing of an abortion in the clinic involved several different stages in which the patients had contact with different employees of the clinic with separate responsibilities. The first contact clearly was with a receptionist, one of several employed at the clinic, whose function was to photocopy the Medicaid card and record other relevant information. There then followed the taking of blood and urine samples, with tests then performed in the clinic laboratory; a physical examination by an internist; the administration of the anesthetic and the abortion; and after-operation care in a recovery room.

It surely must have been common in this busy clinic for several women to be waiting together to proceed to the next stage, in particular during the time required for laboratory testing. Applying common sense and ordinary human experience to the realities of a situation that existed in a busy abortion clinic servicing a number of women on Saturdays, the substantial possibility is presented that there was a mix-up in the handling of the files, after completion of the Martinez laboratory tests, and that notes describing the further processing of another woman were erroneously recorded in the Martinez folder. Surely this is more likely than either the thesis that Ms. Martinez lied or forgot, or the even more dubious hypothesis that two

doctors and a nurse, none with any discernible motive, collaborated with the defendant on this one occasion to manufacture evidence of an abortion that never took place.

Addressing the defendant's conviction on the second count of the indictment, charging the defendant with grand larceny in the third degree in connection with the allegedly fraudulent resubmission of bills, the essential background facts can be simply stated.

The Williamsburg Medical Clinic had been approved for operation during 1975 by both the city and State and was accordingly authorized to perform abortions commencing January 1, 1976, which in fact occurred. From that date the defendant was legally entitled to bill individually for his personal services. However, under the prevailing regulations the clinic itself could not be reimbursed separately until the appropriate agencies had determined its reimbursement rate. That rate appears to have been fixed in April of 1976 at $43.41 per abortion effective March 1, 1976 in a document described as a "rate notification letter". The letter indicates on its face that a copy was sent to the defendant, and a witness testified that it was normal procedure to do so.

The evidence further discloses that in distinction to billings by individual medical providers, clinic billings took the form of a monthly statement itemizing on one document each of the abortions claimed to have occurred during the month. There was presented in evidence monthly billing statements by the clinic for January, 1976 through December, 1976. The first Department response to the monthly statements from the clinic occurred in a Medicaid statement dated September 23, 1976, a copy of which, we are told, was sent to the Williamsburg Medical Clinic. That statement, which has the appearance of a computer printout, responded in a single sheet of paper to monthly billing statements from the clinic for the period extending from January, 1976 through July, 1976. In the shorthand typical of such printouts, it is indicated that the claims embodied in the January and February, 1976 statements were reduced to zero on the basis of Code No. 36. As here pertinent Code No. 36 means that the claims were

rejected because the services were rendered before the clinic became eligible for reimbursement.

In the monthly billing statement for October, 1976, the clinic billed the Department for 11 abortions listed orginally in the January, 1976 statement indicating that the abortions had been performed on a date in October. Curiously in light of the thesis that this resubmission was fraudulent, the names were listed precisely in the sequence in which they had appeared in the January statement. Similarly, the November, 1976 statement listed the names of five persons for that month in the same sequence as those names had appeared in the January statement.

The prosecution's theory with respect to this count is that the defendant, knowing that the clinic was not entitled to reimbursement for abortions performed during January and February, 1976 and that the billing statements for those months had been rejected for that reason, was responsible for the clinic resubmitting the January abortions in the October and November statements as though the abortions had been performed in the later months.

Of the several weaknesses in the proof adduced in support of this count, the most fundamental is that not one word of evidence connects the defendant with the submission of the October and November statements. From an examination of the clinic's monthly billing statements, it is obvious that all, from January, 1976 to December, 1976, were prepared by the same person. No evidence was adduced that this person was the defendant, and indeed it is apparent from an examination of his handwriting in other exhibits, that none of the billing statements, including those for October and November, were written by him. Neither his name nor signature appears on any statement.

In short, the defendant's conviction on this count could be sustained only on the basis of one of two theories: (1) that the principal in a clinic which employs a number of people in a variety of capacities, including personnel primarily concerned with the preparation of billing statements, is criminally answerable for any misstatement in a bill submitted by the clinic, whether or not he was in fact responsible for the misstatement; or (2) that the defendant

must necessarily have been responsible for the inclusion of the resubmitted names in the form in which they appeared even though no evidence is adduced to establish that fact.

There is no basis in law for the first theory, nor any basis in fact or common experience for the second.

On this appeal respondent's brief discloses, although obliquely, an acute awareness of this fundamental failure in the proof. The brief undertakes to make up for this failure by referring, not to evidence in the record, but to an inaccurate paraphrase of the evidence in appellant's brief to the effect that the defendant "thereafter resubmitted the January 1976 vouchers and included them in vouchers mailed in during October and November of 1976." This statement in the brief submitted by defendant's appellate counsel, who had not tried the case, is accompanied by no record reference, and an examination of the record discloses no factual basis for it. The very most that can be fairly inferred from the defendant's testimony is that he was aware that the clinic had not received payment for the January monthly bill and assumed that there had been a resubmission in accordance with a practice to resubmit vouchers that were not paid after six months. It is basic that a statement in an appellate brief is no substitute for the absence of evidence on a critical factual point in the record.

Although not essential to the issue presented, it may be helpful to refer to defendant's testimony bearing on the question, the only relevant evidence presented in the trial, none of it contradicted. He testified that the clinic billing was done by an office employee, Dawn Adams, apparently a new employee hired at or shortly before the time the clinic began to operate and who had been instructed in her duties by Maria Rodriguez, who for many years had been in charge of defendant's Medicaid billing. He denied that he had instructed Dawn Adams or anyone else with regard to the preparation of the clinic billing forms.

In substantial part this testimony is consistent with other relevant evidence in the case. Although an employee of the defendant at the time of the trial, Maria Rodriguez had testified as a witness for the prosecution and gave

what appears to have been accurate, reliable testimony. From her testimony it is apparent that when she was first hired by the defendant in 1971 to, among other things, do his Medicaid billing, the defendant had then instructed her in what was to be done. It is also apparent from her testimony that after a preliminary period of instruction by the defendant she was effectively in charge of his Medicaid billing, specialized in it, and not only prepared all of his individual billings but was authorized to and did sign his name. It is surely consistent with normal experience that during the five years in which Ms. Rodriguez specialized in the defendant's Medicaid billings he came to rely on her more current specialized experience as to what was required by the regulations and would have entrusted her to instruct a new employee assigned to the preparation of the clinic's monthly bills. Significantly the testimony shows that when a change in billing procedures occurred in 1978, it was Maria Rodriguez, not the defendant, who went to school to learn the new procedures.

However one may evaluate the above testimony by the doctor, none of which was contradicted, the hard fact remains that there is a total lack of evidence in this record to establish beyond a reasonable doubt that the defendant was responsible for including in the October and November monthly billings, in the form in which they appeared, previously submitted and rejected abortion claims.

In addition to this fundamental failure in the proof, the prosecution's theory with regard to this count is doubtful in other respects as well. Essentially it rests upon the uncritical acceptance of several propositions.

These assumptions are: that those in charge of billing for a newly formed clinic must necessarily have understood how to respond to a billing problem new in their experience; that a Medicaid statement sent to the clinic disapproving the monthly billing claims for January and February, 1976 must have been read and understood by a defendant accustomed for years to rely on others to handle his billing; and that whoever became aware of the reason for rejection of the January and February, 1976 monthly bills must have accepted that the Department had correctly determined that the clinic could not be reimbursed for

expenses actually incurred in the performance of abortions for which it was duly licensed.

Perhaps most questionable is the realism of a theory that a doctor, specializing in obstetrics and gynecology who, according to his own uncontradicted testimony, had a practice so extensive that he delivered more babies than any other doctor in the hospital with which he was affiliated, who during the years in question had billed Medicaid for over $100,000 a year, only a minute percentage of which has been challenged after an obviously extensive audit of his records, somehow decided in October, 1976 that he would steal a few hundred dollars by causing to be resubmitted in the October and November statements the same names that had been submitted in January and February, 1976, which he knew were records in the possession of the Department that he was billing, and which had only a few weeks before been the subject of study and rejection, and further caused the resubmitted names to be presented in precisely the same sequence in which they had appeared in the January and February, 1976 statements, presumably in order to expedite the discovery of his fraud. It is doubtful that what occurred here is sensibly interpreted as evidence of an intent to defraud. It seems to me more reasonably explained as a result of the inexperience or ineptitude of his billing employee, the defendant's own inexperience or ineptitude, or more likely than either, a failure of communication and understanding between him and his billing employee as to how the bills should be resubmitted and what the pertinent rules required.

The remaining counts, grand larceny in the second degree, and the bulk of the counts alleging the offering of a false instrument for filing in the first degree, all involve repetitions of the billing practice previously described. Some additional background facts may be helpful to an understanding of the issue presented.

At all relevant times, doctors providing Medicaid services billed on a form that indicated the nature of the services provided by a code number. The code numbers for obstetrical services were 4825 and 4826. Code No. 4825 was described as: "Total obstetrical care (with or without low forceps, and/or episiotomy)". The code numbers for after

birth care were 9038 and 9035. Code No. 9038, specifically referring to services by a pediatrician, provided: "Total new born care in hospital including physical examinations of the baby and discussion with the mother during the hospital stay (total fee for minimum three-day stay)." Code No. 9035 describes identical services when performed by a physician other than a pediatrician.

During the period of the indictment it was the conceded practice of the defendant in connection with his delivery of babies to bill the Department of Social Services under Code No. 4825 for which reimbursement of up to $200 is provided, and also to bill for new born care under 9035 providing reimbursement for up to $15. Defendant acknowledged that with regard to each baby he delivered he had assigned the care of the baby to a hospital pediatrician, and that he was aware that the pediatricians were separately billing under the appropriate code number. The essence of all these counts is that the defendant defrauded the Department of Social Services to the extent of an additional $15 for each delivery by claiming to have rendered services that he did not render.

Defendant testified, and this aspect of his testimony is not disputed, that it was his practice after delivery to examine the baby, that he thereafter maintained communication with the pediatrician so that he could provide the mother with information concerning the baby, and that from time to time as the situation required he would see the baby during the baby's stay at the hospital and consult with the pediatrician about the child. He testified that he believed that these services entitled him to bill for new born care under Code No. 9035.

As against the defendant's testimony, the prosecution presented evidence that it was generally known in the medical profession that the postbirth services which the defendant testified to performing were a normal part of the duties of an obstetrician and did not embrace the "total new born care" of the kind usually provided by a pediatrician. In addition, Dr. Jacoby of the New York State Department of Health testified that Code No. 4825 embraced Medicaid reimbursement to the obstetrician for the total care of the mother from the diagnosis of pregnancy until

mother and baby left the hospital, and included consultations with the pediatrician assigned to care for the baby as well as consultations with the mother about the baby. He denied that the services testified to by the defendant represented the total new born care set forth in Code Nos. 9038 and 9035, although he acknowledged that this interpretation had never been embodied to his knowledge in a written directive or regulation and that he himself became associated with the Medicaid system in 1975, long after the code numbers had been formulated.

As already noted, the evidence was legally sufficient to sustain the jury's verdict on the various counts. Although the defendant's uncontradicted testimony established that it was his practice to perform services specifically detailed in Code Nos. 9038 and 9035, it is questionable from an examination of the face of the code numbers that such services could correctly be interpretated as constituting "total new born care".

Nevertheless a painstaking examination of the trial record raises doubts as to the soundness of the jury's implicit conclusion that the defendant's billing practice represented a purposeful effort to defraud the Department to the extent of $15 for each baby that he had delivered. The defendant, licensed to practice medicine in this State in 1965 and who became an authorized Medicaid provider in 1968, testified that he adopted the billing practice at issue when he first became a provider on the basis of inquiries that he then made. He also testified, and this was independently confirmed by Maria Rodriguez, that at the time he first began to bill and for some seven years thereafter the prescribed billing form included the two code numbers on a single form. The defendant testified, and this is not contradicted, that he was never informed by the Department that the practice he followed was improper or wrong.

It would be one thing to infer a fraudulent intent from the billing practice in question if adopted by an experienced doctor well versed in Medicaid billing procedures. The inference is far less persuasive when applied to an inexperienced physician who adopted this practice when he first became a Medicaid provider at a time when he had no

prior experience with the system. As to such a doctor, there is at least a possibility that the practice then adopted represented an honest error in judgment in interpreting an unfamiliar billing system.

The fact that the doctor billed on forms that included on one form both code numbers then, and for some seven years thereafter, tends to rebut the inference of a fraudulent intent. Medicaid was then in its infancy. Neither the medical profession as a whole, nor the defendant in particular, had the kind of experience with the Medicaid system that would have left the defendant comfortable that a fraudulent billing practice apparent on the face of the invoices that he repetitively filed would not have been apparent to the authorities. That he was not informed that his billings were wrongful or erroneous may have confirmed him in the belief, long before the years embraced in this indictment, that what he was doing was lawful and proper, if that had ever seemed doubtful to him. The sad reality appears to be that if the appropriate authorities had performed their duty with care, the error, if it were an error, would have been picked up early, the defendant would have been required to make restitution to the extent that he had been improperly reimbursed, and these multiple counts would never have been the subject of a criminal prosecution.

The defendant's conviction on all the counts relating to the billing practice should be reversed and these counts remanded for a new trial because of prejudicial trial errors. One, limited in character, and directly related to these counts, was the trial court's ruling sustaining objections to questions by defense counsel designed to elicit that the $200 reimbursement provided for obstetricians under Code No. 4825 was significantly below the fee normally charged for such services. Although the trial court's quick response to this attempted line of inquiry is understandable, he failed to appreciate that it was quite relevent to a determination of the defendant's intent in light of the prosecution's heavy reliance on the medical profession's general understanding of the distinction between obstetrical and pediatric services. If in fact the reimbursement provided under Code No. 4825 for obstetrical services was significantly

below the usual professional fee, the jury might reasonably have regarded that as a fact bearing on the good faith character of the defendant's interpretation of the relevant code numbers.

The central error in the trial, and one that independently requires reversal of every count of which the defendant was convicted, occurred during the cross-examination of the defendant. In the most extensive portion of that cross-examination the trial prosecutor was permitted over repeated objections to violate basic principles of law.

Numerous questions were put to the defendant on the basis of highly critical findings by the Department of Health in a survey of the Williamsburg Medical Clinic that occurred sometime in 1978. The cumulative effect of these questions as put by the trial prosecutor, was to convey to the jury that the Department of Health had found in the operations of the clinic conditions and practices that constituted a danger to the health of those who came to the clinic. Wholly apart from the objection of defendant's trial counsel that the prosecutor was reading from the report of the Department of Health during the cross-examination, the jury could have been in no possible doubt as to the source of the questions. The very first question in this sequence specifically referred to a survey of the Department of Health. The survey was specifically referred to at intervals during the interrogation, and was emphatically repeated in the several questions with which this segment of the examination was concluded. In short, extensive hearsay information of an extremely prejudicial nature was effectively conveyed to the jury in violation of basic principles of law. (See *People v McCormick,* 303 NY 403; *People v Marendi,* 213 NY 600.)

What occurred would have constituted prejudicial error even if the subject matter of the Department of Health survey was relevant to any issue in the case, which it clearly was not, and even if the questions had some legitimate relevance to the defendant's credibility, which they did not, as respondent's brief implicitly concedes. The central vice of what occurred is that the defendant, a doctor charged with varying forms of Medicaid fraud, was effectively convicted of gross professional indifference to the

welfare of his patients on the basis of findings by a presumably qualified and disinterested government department, the reliability of which findings the jury could not possibly evaluate, and which the defendant had no effective way to rebut. His denials and disclaimers, many of them ineffectively presented by a foreign-born defendant whose limited capacity to communicate was apparent throughout his testimony, pitted an interested witness charged with crimes against the presumably disinterested findings of an independent government agency.

The only possible effective response would have been for the defense to have called employees of the clinic during the period of the survey, including professionals, who were far more directly implicated in the omissions and improper practices described in the prosecutor's questions than the defendant, to deny in detail what had been presented to the jury by way of the prosecutor's questions. If such an effort had been made it almost certainly would not have been permitted by the trial court, for it would have inevitably diverted the trial into an extended contest over issues that had no proper place in it. Instead the defendant was irretrievably prejudiced by the wholesale introduction of irrelevant hearsay evidence to which he had no possible way of responding effectively.

Even if the questions put by the prosecutor in fact related to illegal or immoral acts by the doctor of a kind relevant to an evaluation of his credibility, and even if they had been appropriately phrased so as not to introduce to the jury extensive hearsay findings by a government agency, it would seem obvious that the unfair prejudicial impact of what occurred far exceeded any legitimate probative value. In fact most of the questions did not involve misconduct by the defendant himself but rather alleged acts of omissions by employees of the clinic, including other doctors and registered nurses, of which the defendant could well have been unaware and which would at best involve a reflection on his capacity to administer and supervise the behavior of others.

In respondent's brief it is implicitly conceded that the cross-examination could not be sustained as appropriately addressed to the defendant's credibility. The sole justifica-

tion advanced for what occurred is the claim that by questions to the defendant's character witnesses, and in the examination of the defendant himself, the defense sought to elicit that he was a conscientious and competent doctor and accordingly opened the door to questions contradicting that impression. An examination of the record, with particular reference to the page citations proffered in respondent's brief, discloses no support for the claim that the character witnesses were asked questions designed to elicit a favorable view of the defendant's professional capacity and competence. As often happens, several of the character witnesses strayed into that area in unresponsive answers to properly put questions and were quickly stopped by the Trial Judge. Nor is there anything in the defendant's brief description of his background and discussion of the general procedures of the clinic that supports respondent's thesis that his ability and conscientiousness as a physician had been put in issue. If far more had been said that was relevant to that question by the defendant and the witnesses called by the defense than this record discloses, it would not remotely justify the cross-examination that was permitted here.

Accordingly, the judgment of the Supreme Court, New York County (GALLIGAN, J., and jury) rendered January 7, 1982, convicting defendant of one count of grand larceny in the second degree, one count of grand larceny in the third degree, and 163 counts of offering a false instrument for filing in the first degree, should be reversed on the law and on the facts, counts 2 and 117 of the indictment should be dismissed, and the remaining counts should be remanded for a new trial.

Ross and CARRO, JJ., concur with SANDLER, J. P.; SILVERMAN, J., concurs in the result only.

Judgment, Supreme Court, New York County, rendered on January 7, 1982, unanimously reversed, on the law, and the facts, counts 2 and 117 of the indictment dismissed, and the remaining counts remanded for a new trial.